UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDIANA PROTECTION AND | ) | |
| ADVOCACY SERVICES COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 1:08-cv-1317-DFH-JMS |
| v. | ) | |
| | ) | |
| COMMISSIONER, INDIANA | ) | |
| DEPARTMENT OF CORRECTION, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON DEFENDANT'S MOTION TO DISMISS

*Introduction*

Plaintiff Indiana Protection and Advocacy Services Commission ("IPAS") has brought suit against the Indiana Department of Correction ("IDOC"). IPAS challenges IDOC's alleged practice of isolating and secluding prisoners with serious mental illnesses and its failure to provide those prisoners with sufficient treatment programs and placements. IPAS claims that IDOC's practices violate the Eighth Amendment, the Americans with Disabilities Act (42 U.S.C. § 12132) and the Rehabilitation Act (29 U.S.C. § 794). IDOC has moved to dismiss IPAS's suit under Rule 12(b)(1), arguing that IPAS lacks standing to sue on behalf of unidentified individuals and that this court lacks jurisdiction over a supposedly "intramural" dispute between state agencies. As explained below, the court denies IDOC's motion. First, by suing on behalf of mentally ill individuals, IPAS is

exercising the powers and duties assigned to it by federal statute, and that assignment is constitutional. Second, this dispute is not a typical "intramural" dispute between state agencies that the governor should resolve. Instead, IPAS is trying to carry out a federal statutory directive to act independently of other state agencies to protect and advocate for mentally ill individuals. The governor has no authority to resolve this dispute by telling IPAS to drop this lawsuit.

### *The Role of IPAS in Enforcing Federal Law*

IPAS is a "protection and advocacy" or "P&A" organization established pursuant to federal law. In *Disability Rights Wisconsin, Inc. v. State of Wisconsin Department of Public Instruction*, 463 F.3d 719, 724-25 (7th Cir. 2006), the Seventh Circuit outlined the role of protection and advocacy organizations. As a condition of federal funding, states are required to designate protection and advocacy organizations to act on behalf of people with mental illness, developmental disabilities, and other disabilities. The specific statute at issue in this case is the Protection and Advocacy of Mentally Ill Individuals Act ("PAIMI") enacted in 1986.[1] Congress found that "individuals with mental illness are vulnerable to abuse and

---

[1]The other protection and advocacy laws are the Protection and Advocacy for Developmental Disabilities Act, 42 U.S.C. § 15043 *et seq.*, and the Protection and Advocacy for Individual Rights Act, 29 U.S.C. § 794e. Together, these statutes are referred to as the federal "Protection and Advocacy" or "P&A," statutes, which "Congress enacted after concluding that state systems for protecting the rights of individuals with disabilities varied widely and were in many cases inadequate." *Disability Rights Wisconsin*, 463 F.3d at 722. The Seventh Circuit explained in *Disability Rights Wisconsin* the reasons for favoring the acronym PAIMI in light of 1988 amendments to the Act. *Id.* at 722 n.2.

serious injury" and enacted the PAIMI to "ensure that the rights of individuals with mental illness are protected" and to "assist States to establish and operate a protection and advocacy system for individuals with mental illness which will . . . protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes . . . ." 42 U.S.C. §§ 10801(a)(1), (b)(1), (b)(2)(A).

The PAIMI requires each state, as a condition of receiving certain federal funding, to designate a "system" (*i.e.*, a government agency or private organization) as the protection and advocacy service for the state.  42 U.S.C. § 10803.  The designated system or entity must comply with the conditions of independence and authority set forth in 42 U.S.C. § 10805.  If a government agency is designated, the agency "shall be independent of any agency which provides treatment or services (other than advocacy services) to individuals with mental illness" and "shall have the capacity to protect and advocate the rights of individuals with mental illness."  42 U.S.C.A. § 10804.  The designated protection and advocacy agency must have, under federal law:

> the authority to . . . pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State; and pursue administrative, legal, and other appropriate remedies on behalf of an individual who . . . was an individual with a mental illness; and  . . . is a resident of the State, but only with respect to matters which occur within 90 days after the date of discharge of such individual from a facility providing care or treatment.

42 U.S.C. §§ 10805(a)(1)(B), (C).

The federal statutory definition of an "individual with mental illness" includes any individual diagnosed with a significant mental illness or emotional impairment who is an inpatient or resident in a facility rendering care or treatment, including individuals involuntarily confined in a detention facility, jail, or prison, and Congress has defined "facilities" to include jails and prisons. 42 U.S.C. §§ 10802(3), (4); 42 C.F.R. § 51.2.  In other words, under federal law, protection and advocacy services must have the ability to bring lawsuits on behalf of mentally ill prisoners.

Indiana has chosen to designate IPAS as the entity in Indiana to receive federal funding for protection and advocacy services for the mentally ill under the PAIMI.  See Ind. Code § 12-28-1-1, *et seq.*  As a matter of federal law, therefore, IPAS must have the independence and authority required under the PAIMI, including the authority to bring lawsuits on behalf of mentally ill prisoners.

IPAS is controlled by a governing board of thirteen persons.  Ind. Code § 12-28-1-6.  Four of its members are appointed by the Governor.  The other nine are appointed by majority vote of the governing board itself.  Ind. Code § 12-28-1-6(a)(1), (2).  No board member may be an official or employee of any state agency that delivers services to the population served by IPAS.  Ind. Code § 12-28-1-6(b).  Under the PAIMI, the IPAS board must "include a significant representation of individuals with mental illness who are, or have been eligible for services, or who have received or are receiving mental health services, and family members,

-4-

guardians, advocates, or authorized representatives of such individuals." 42 C.F.R. § 51.22(b)(2).  The PAIMI also requires that IPAS be guided by an advisory council, "at least 60 percent of the membership of which shall be comprised of individuals who have received or are receiving mental health services or who are family members of such individuals."  42 U.S.C. § 10805(a)(6)(B).

*Standard for Jurisdictional Challenge*

When a defendant moves under Rule 12(b)(1) to dismiss for lack of subject matter jurisdiction based on the allegations in the complaint, the court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the plaintiff.  *Long v. Shorebank Development Corp.*, 182 F.3d 548, 554 (7th Cir. 1999);  *United Transp. Union v. Gateway Western Ry. Co.*, 78 F.3d 1208, 1210 (7th Cir. 1996).  The court may consider additional evidence that the parties submit to determine whether subject matter jurisdiction exists.  *Long*, 182 F.3d at 554.  Here, IPAS submitted the affidavit of Thomas Gallagher, the executive director of IPAS.

*Discussion*

I.     *Standing*

The standing requirements under Article III of the Constitution are well settled:   "injury in fact, a causal connection between the injury and the

defendant's conduct, and likely redressability through a favorable decision." *Winkler v. Gates*, 481 F.3d 977, 979 (7th Cir. 2007), citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).   "Ordinarily . . . the allegation [of a reasonable probability of suffering tangible harm] is enough."  *MainStreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 745 (7th Cir. 2007).  The components of standing ensure that plaintiffs possess "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions."  *Baker v. Carr*, 369 U.S. 186, 204 (1962).

Without referring in its opening brief to the applicable statutes or cases involving protection and advocacy agencies, IDOC argues that IPAS lacks standing because it has not alleged that IPAS itself has been injured and has not identified specifically any of its constituents who have been injured.  IPAS does not argue that it has suffered injury or that, as an agency, it will benefit from a favorable decision.  IPAS contends that it has associational standing to bring suit on behalf of its "client-constituents."  Pl. Response 9.  As the party seeking to invoke federal jurisdiction, IPAS has the burden of establishing that it meets the requirements of standing.  *DH2, Inc. v. S.E.C.*, 422 F.3d 591, 596 (7th Cir. 2005).

As described above, by Congressional design, IPAS and the protection and advocacy agencies of other states are intermediary entities.   They can be governmental agencies (like IPAS) or quasi-governmental entities that are

responsible for enforcing federal and state law on behalf of individuals with disabilities who otherwise would face perhaps insurmountable obstacles to seeing their rights enforced and their interests protected. The protection and advocacy system is not unique in this regard. In many fields, Congress has empowered other third parties, including state and federal agencies, to protect the rights of individuals disadvantaged for other reasons. See, *e.g.*, 42 U.S.C. § 3616a(a)(1) (authorizing fair housing organizations to "obtain enforcement of the rights granted by title VIII [of the Fair Housing Act] . . . through such appropriate judicial or administrative proceedings . . . as are available"); 42 U.S.C. § 2000e-5(f)(1) (authorizing the Attorney General to initiate civil actions against private employers under Title VII of the Civil Rights Act of 1964) and § 2000e-4(g)(6) (authorizing the Equal Employment Opportunity Commission to "intervene in a civil action brought . . . by an aggrieved party"); 29 U.S.C. § 1132(a)(2) (granting Secretary power to initiate various civil actions under the Employee Retirement Income Security Act); 15 U.S.C. § 15c (authorizing state attorneys general to bring a federal action on behalf of the state's citizens under federal antitrust law).

These other entities certainly have standing to carry out Congress's mandate in the federal courts because, as the Supreme Court has commented, while agencies normally do not have standing in their own right, Congress has the ability to grant that standing "by say[ing] so." *Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 129-30 (1995) (holding that without clear statutory authority to do so,

government agency did not have standing to appeal arguably inadequate award of compensation to injured longshoreman, and collecting statutes that do provide clear authority for government agencies to act on behalf of individuals in similar matters).  As part of the PAIMI, as with these other statutes, Congress has said so. As a condition of Indiana's receipt of certain federal funding, IPAS must have standing to sue on behalf of mentally ill constituents.  Congress cannot waive the constitutional requirements of Article III, but once those constitutional requirements are met, Congress has clearly vested IPAS and other protection and advocacy organizations with "the authority to . . . pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State."  42 U.S.C. §§ 10805(a)(1)(B).

In fact, courts around the country have rejected similar standing challenges to protection and advocacy services.  See, *e.g.*, *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1109-11 (9th Cir. 2003); *Doe v. Stincer*, 175 F.3d 879, 885-86 (11th Cir. 1999) (holding that 42 U.S.C. § 10805 confers standing to bring suit on behalf of individuals with mental illness); *New Jersey Protection & Advocacy, Inc. v. Davy*, 2005 WL 2416962, at *2-3 (D.N.J. Sept. 30, 2005); *University Legal Servs., Inc. v. Saint Elizabeths Hosp.*, 2005 WL 3275915, at *4-5 (D.D.C. July 22, 2005) ("By providing [P&As] the authority to sue on behalf of their constituents, Congress has cleared away any non-constitutional impediments for ULS . . . in situations stated in § 1085."); *Aiken v. Nixon*, 236 F. Supp. 2d 211, 224 (N.D.N.Y.

2002) (finding that "in light of the fact that the Court has concluded that [the individual plaintiff] has standing to bring his individual claim, there are also sufficient allegations to find that [the P&A plaintiff] has associational standing to bring the same claims on behalf of its constituents."); *Risinger v. Concannon*, 117 F. Supp. 2d 61, 68-70 (D. Me. 2000); *Advocacy Center v. Stalder*, 128 F. Supp. 2d 358, 365-66 (M.D. La. 1999); *Brown v. Stone*, 66 F. Supp. 2d 412, 425 (E.D.N.Y. 1999) ("standing appears warranted" under 42 U.S.C. § 10805); *Rubenstein v. Benedictine Hospital*, 790 F. Supp. 396, 408-09 (N.D.N.Y. 1992) (finding standing under 42 U.S.C. § 10801, given its "broad remedial purposes" and "the statutory language apparently conferring a right upon entities such as DAI to pursue legal remedies"); *Michigan Protection and Advocacy Service, Inc. v. Babin*, 799 F. Supp. 695, 702 n.12 (E.D. Mich. 1992) (finding in reference to the PAIMI that "[i]t was clearly the intention of Congress that the MPAS and other similar advocacy groups represent and, if necessary, litigate on behalf of individuals suffering from developmental disabilities"), *aff'd on other grounds*, 18 F.3d 337 (6th Cir.1994); *Protection and Advocacy, Inc. v. Murphy*, 1992 WL 59100, *10 (N.D. Ill. 1992) ( "Federal courts have uniformly found that protection and advocacy systems have standing to sue in their own name to protect the rights of injured developmentally disabled or mentally ill individuals."); *Goldstein v. Coughlin*, 83 F.R.D. 613, 614 (W.D.N.Y. 1979) (reasoning that "given the Congressional purpose to provide retarded persons with legal representation, as revealed in § 6012," state's designated advocacy group "need show no injury to itself in order to have standing in this action"); but see *Missouri Protection and*

*Advocacy Services., Inc. v. Carnahan*, 499 F.3d 803, 809-10 (8th Cir. 2007) (denying associational standing without discussion of protection and advocacy statutes or Congressional intent); *Association for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Board of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994) (same).

Statutory standing is clear.  In fact, this case presents the unusual drama of a state challenging the constitutionality of federal statutes under which the state receives federal funds.  IDOC is challenging whether the federal statutory grant of standing to IPAS – a key condition of federal funding to Indiana – violates Article III of the United States Constitution.  Constitutional standing requirements cannot be waived, of course, but the statutory grant of standing to protection and advocacy groups means that the so-called "prudential" elements of standing doctrine, including the limits on asserting the rights of others, do not apply.  See, *e.g.*, *Oregon Advocacy Center v. Mink*, 322 F.3d at 1109-10 (explaining statutory effects on standing for protection and advocacy organizations); *Risinger v. Concannon*, 117 F. Supp. 2d at 68-70 (same).

As for the constitutional elements, courts usually structure the analysis of associational standing and the organization's ability to bring suit on behalf of its members under the test articulated by the Supreme Court for private organizations in *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977).  Under the *Hunt* test, the protection and advocacy organization must show

that (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claims asserted, nor the relief requested, requires the participation of individual members in the lawsuit.   *Hunt*, 432 U.S. at 343.   The third *Hunt* requirement does not derive from the Constitution.   Instead, it is a judicially imposed limitation, *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 556-57 (1996), which may be overridden by Congress. *Family & Children's Ctr., Inc. v. School City of Mishawaka,* 13 F.3d 1052, 1059 (7th Cir.1994).   It has been overridden by Congress in the realm of protection and advocacy organizations.   *E.g.*, *Oregon Advocacy Center v. Mink*, 322 F.3d at 1109-11.

IPAS easily satisfies these constitutional criteria.   Its mentally ill constituents clearly would have standing to sue on their own behalf for violations of federal and state law in the conditions of their custody.   See *Disability Rights Wisconsin, Inc. v. Walworth County Board of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008) (applying *Hunt* test and recognizing that protection and advocacy organization would have standing if any individual whose rights it was supposed to protect would have standing).   The interests that IPAS seeks to protect are not merely germane to the agency's purpose, they are its reason for existence.

In this case, IPAS alleges generally in its complaint that "a significant number of prisoners committed to the care and custody of [IDOC] have serious

mental illnesses that significantly impede their ability to function within the prison environment," and that IDOC "provides insufficient programs and placements to treat these prisoners and many are confined in segregation or excessively isolated and harsh conditions which exacerbate their illnesses and conditions where they fail to receive adequate mental health care." Complaint ¶ 1; see also ¶ 72 (conditions in the segregation units maintained by IDOC create "a substantial risk of serious harm to the mentally ill prisoners who are confined there, including IPAS' clients and constituents, and in fact cause them ongoing and severe harm"); ¶ 56 (confinement in isolation exacerbates the illnesses of prisoners who are mentally ill and is "extremely deleterious" to their mental health).

More specifically, IPAS alleges that mentally ill prisoners in the Residential Treatment and Chronic Care Units located at the Indiana State Prison in Michigan City have "infrequent individual contact with mental health professionals." Complaint ¶¶ 38, 40, 42-43. IPAS alleges that prisoners held in the Secure Mental Health Treatment Unit at the New Castle Correctional Facility are held in cells with solid cell doors and must interact with mental health professionals:

> in short discussions at cell fronts which require the prisoner and professional to yell at each other through the solid cell door. This is an unsatisfactory and inappropriate mental health intervention inasmuch as there is absolutely no privacy. Because of the lack of confidentiality, it is extremely difficult to accurately assess the prisoner's mental health functioning, and prisoners do not disclose necessary information concerning their mental conditions.

Complaint ¶ 54; see also ¶¶ 44, 46, 48, 54.  IPAS alleges that the ACT program (a behavior modification program for prisoners in the SMHTU and other IDOC facilities) is not adequate or effective at treating mental illness.  Complaint ¶ 55.  IPAS alleges that mentally ill prisoners held in the Custody and Control Unit in the Wabash Valley Correctional Facility are often violently removed from their cells by armored correctional officers when those prisoners refuse to comply with officer orders because of their mental illnesses.  Complaint ¶¶ 60, 64-65.  These allegations of injury are sufficient to show that IPAS brings its suit on behalf of members of its constituency who, if IPAS's allegations are taken as true, are suffering actual injury under IDOC's policies.  IPAS has standing to bring this lawsuit.

IDOC argues that while IPAS complains generally about IDOC procedures and policies allegedly harming mentally ill prisoners, it has not identified any specific individuals whose rights actually have been violated and thus has not met its constitutional standing requirements.  Def. Reply 3.  The court disagrees.  The pleading requirement is not heightened for organizations to show standing, even under *Hunt*.  To meet the first prong of that test, protection and advocacy organizations such as IPAS need only allege injury to their members or constituents.  *Disability Rights Wisconsin*, 522 F.3d at 802.  Contrary to IDOC's contention, the Seventh Circuit does not require that the member or members suffering injury be named – actually, the court stated the opposite.  *Disability Rights Wisconsin*, 522 F.3d at 802 (the first *Hunt* prong "still allows for the

member on whose behalf the suit is filed to remain unnamed by the organization").  IDOC has not pointed to any provision in the PAIMI or the Indiana statutes creating IPAS that could reasonably be read to require that IPAS name a specific individual in bringing suit to redress violations of the rights of individuals with mental illness.

IPAS has alleged that its constituents, mentally ill prisoners, are being housed in specific separation units within IDOC's system and have suffered injury as a result of their isolation and limited access to mental health treatment. Congress granted IPAS standing by statute, and IPAS has sufficiently pled actual injury to its constituents so as to meet the constitutional requirements of Article III standing under *Hunt* and *Disability Rights Wisconsin*.  IDOC's motion to dismiss for lack of standing must be denied.

II.     *Disputes Between State Agencies*

IDOC also moves to dismiss IPAS's complaint on the ground that it presents only an "intramural" dispute between two state agencies.  Def. Br. 6-7; Def. Reply 8-10.  The Seventh Circuit has advised in dicta that "federal courts should not get involved unnecessarily in what may be intramural struggles of state government even if invited to do so by one of the contenders."  *Mazanec v. North Judson-San Pierre School Corp.*, 763 F.2d 845, 848 (7th Cir. 1985).  And it is difficult to see how a case or controversy exists within the meaning of Article III of the

Constitution if, for example, one state agency sues another and the heads of both agencies serve at the pleasure of the governor.  In that scenario, it would be as if the governor were suing himself.

But IPAS is not a traditional state agency, and it is independent of the governor.  IPAS is funded by the federal government under the PAIMI.  It receives no state funding and has authority independent of the state to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State." 42 U.S.C. § 10805(a)(1)(B); see also Ind. Code § 12-28-1-12(3) (IPAS has legal authority to "provide legal and other advocacy services throughout Indiana to individuals or organizations on matters related to the protection of the legal and human rights of individuals with a developmental disability, individuals with a mental illness, and individuals who are seeking or receiving vocational rehabilitation services").

The Commissioner of the Indiana Department of Correction serves at the pleasure of the Governor.  IPAS is independent from the Governor.  As Congress has mandated in the PAIMI, IPAS is governed by a multi-member governing board consisting of thirteen individuals.  42 U.S.C. § 10805(c)(1); Ind. Code § 12-28-1-6. Of those thirteen people, a minority (four) are appointed by Indiana's Governor and the other nine are appointed by majority vote of the board itself.  Ind. Code § 12-28-1-6(a).  IPAS, then, by both funding and organizational structure, is

effectively insulated from direct control by the state's executive.  Unlike traditional state agencies, IPAS is, by Congressional design and mandate, independent from policy dictates of the state government.  This is not a case in which one state agency seeks a larger slice of a limited state budget at the expense of a sister agency.  Nor is it a case in which a rogue state agency is attempting to circumvent state policy, nor a case in which one agency reporting to the state's highest executive is suing another state agency reporting to the state's highest executive. IPAS has raised an actionable case or controversy against IDOC.

Defendant IDOC's motion to dismiss is denied.

So ordered.

Date: July 21, 2009

_David F Hamilton_

_____

DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

David A. Arthur
INDIANA OFFICE OF THE ATTORNEY GENERAL
David.Arthur@atg.in.gov, Michelle.Waire@atg.in.gov, Brenda.Mahana@atg.in.gov

Eric James Beaver
INDIANA OFFICE OF THE ATTORNEY GENERAL
eric.beaver@atg.in.gov, michelle.waire@atg.in.gov

Karen T. Davis
INDIANA PROTECTION AND ADVOCACY SERVICES
ktdavis@ipas.in.gov

Debra Jean Dial
INDIANA PROTECTION AND ADVOCACY SERVICES
djdial@ipas.IN.gov

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org, kkendall@aclu-in.org

Gary W. Ricks
INDIANA PROTECTION AND ADVOCACY SERVICES
gricks@ipas.IN.gov

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

David R. Smith
INDIANA PROTECTION AND ADVOCACY SERVICES
drsmith@ipas.in.gov