## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| INDIANA PROTECTION AND ADVOCACY SERVICES COMMISSION,  on behalf of its clients and constituents, JOSHUA HARRISON, GREGGORY SIMS, and JAMES PANOZZO, on their own behalf and on behalf of a class of similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>COMMISSIONER, INDIANA DEPARTMENT OF CORRECTION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. 1:08-cv-01317-TWP-MJD<br>)<br>)<br>)<br>)<br>)<br>) |

## ENTRY FOLLOWING BENCH TRIAL

A bench trial commenced in this case on July 25, 2011 and concluded on July 29, 2011. Plaintiffs, Indiana Protection and Advocacy Services Commission ("IPAS"), Joshua Harrison, Greggory Sims, and James Panozzo (collectively the "Plaintiffs"), filed an action against the Commissioner of the Indiana Department of Correction ("IDOC") claiming that the continual confinement of seriously mentally ill prisoners in segregation violates their right to be free from cruel and unusual punishment.  The parties were present by their counsel of record. Evidence was submitted and thereafter, the parties submitted supplemental records as part of the evidence, and the Court, accompanied by counsel, toured portions of two of the prisons discussed during the trial.  Given the volume of evidence, 29 volumes and a five volume transcript, post-trial briefs were then filed.  This Entry shall constitute the Court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52.[1]  The Court hereby renders its final

---

[1] Any finding of fact that is more properly considered a conclusion of law is adopted as such and vice versa.  In addition, the Court recognizes that there was conflicting testimony on some of the issues presented at trial and

decision regarding the matters presented at trial and finds Plaintiffs have prevailed as to their Eighth Amendment claim.

## I.   FINDINGS OF FACT[2]

**A.    The Parties**

The Plaintiffs.  In 1986, upon finding that "individuals with mental illness are vulnerable to abuse and serious injury," Congress enacted the Protection and Advocacy for Individuals with Mental Illness Act, the Protection and Advocacy for Developmental Disabilities Act, and the Protection and Advocacy for Individual Rights Act (collectively, the "PAIMI Act"). The purpose of the PAIMI Act is to "ensure that the rights of individuals with mental illness are protected" and to "assist States to establish and operate a protection and advocacy system for individuals with mental illness which will . . . protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes. . . ." 42 U.S.C. §§ 10801(a)(1), (b)(1), (b)(2)(A).

The PAIMI Act provides funding for a state on the condition that the state designates a "protection and advocacy system" to accomplish these goals.  42 U.S.C. § 10803(2)(A).  IPAS is Indiana's designated protection and advocacy system under the PAIMI Act.  The PAIMI Act gives a designated protection and advocacy system such as IPAS the authority to investigate incidents of abuse and neglect of individuals with mental illness and to pursue administrative,

---

discussed herein.  The Court has considered all of the evidence presented by the parties and the credibility of all of the witnesses in arriving at its findings of fact.

[2] Certain issues of fact cannot be resolved in this case without making a determination of which version of the pivotal events was more credible.  In making this and other determinations as to contested issues, the Court has considered the customary factors associated with credibility—*e.g.,* demeanor, detail, consistency, opportunity to observe or perceive the events testified to. It has not relied solely on the number of witnesses who related a particular event or on any other single factor.  The Court must weigh a number of issues when making a credibility determination of a witness, including the witness's interest in the outcome of the case, his or her candor, and the extent to which he or she has been supported or contradicted by other credible evidence.  Courts have also weighed such factors as a witness's state of mind, strength of memory, and demeanor and manner on the witness stand. *Valdez v. Church's Fried Chicken, Inc.*, 683 F.Supp. 596, 606 (W.D. Texas 1988) (citing *Heelan v. Johns–Manville Corp.*, 451 F. Supp. 1382, 1385 (D. Colo. 1978)).

legal, and other remedies on behalf of those individuals.  42 U.S.C. § 10805(a)(1).  Accordingly,

IPAS proceeds here on behalf of the plaintiff class pursuant to the PAIMI Act.  The Court earlier

found that the proposed class was properly certified pursuant to Rule 23(a) and Rule 23(b)(2) of

the Federal Rules of Civil Procedure.  *See Ind. Prot. and Advocacy Servs. Comm'n v. Comm'r,*

*Ind. Dept. of Corr.*, No. 1:08-cv-01317-RLY-JMS, 2010 WL 1737821 (S.D. Ind. Apr. 27, 2010).

The plaintiff class is defined as:

> all current and future mentally ill prisoners who are committed to the Indiana
> Department of Correction and who are housed in a setting in Department of
> Correction institutions or in the New Castle Correctional Facility that features
> extended periods of time in cells, including, but not limited to, prisoners in
> disciplinary segregation, administrative segregation, or in the New Castle
> Psychiatric Unit.

IPAS is the designated entity proceeding on behalf of the class.

> The Defendant.  The defendant is IDOC Commissioner Bruce Lemmon who is being

sued in his official capacity only.

## B.      Overview of the IDOC

As of April 1, 2011, the IDOC housed approximately 26,800 adult offenders in a number

of facilities throughout Indiana.  Medical and mental health care services are provided to IDOC

prisoners by employees of, and contractors with, a private company that has contracted with the

IDOC.   Until very recently, this company was known as Correctional Medical Services

("CMS"), however, CMS merged with another entity and is now known as Corizon.

A number of the IDOC facilities have segregated housing units.  Broadly speaking, there

are two types of segregation—disciplinary segregation and administrative segregation.   A

prisoner may be placed in disciplinary segregation for violating prison or IDOC rules.

According to *The Use and Operation of Adult Disciplinary Segregation* manual, prisoners may

be placed into these units for a definite time period pursuant to disciplinary segregation, as set

out in Administrative Procedure 02-01-112.   In contrast, a prisoner may be placed in administrative segregation if the prisoner is considered a threat to the safety and security of the facility or its operations; even though they have committed no disciplinary offense. For example, a prisoner may be placed in administrative segregation for actions that may pose a risk of escape, other risk, having a history of extensive misbehavior, or being affiliated with a gang.  Prisoners may be placed in these units for an indefinite time period, subject to periodic administrative review, as set out in Administrative Procedure 02-01-111.

Housing for prisoners within IDOC facilities is either in the prison's general population, one of the segregation units, or another specially designated unit.  The New Castle Psychiatric Unit is included in the definition of the plaintiff class because of its similarity to conditions of IDOC segregation units and because the New Castle Psychiatric Unit provides the highest and most intense level of mental health care available to prisoners within the IDOC.

**C.      IDOC Facilities**

There are only two prisons which house adult female offenders within the IDOC, the Indiana Women's Prison ("IWP") and the Rockville Correctional Facility ("Rockville").  With respect to adult males, there are a number of facilities which house them.  One facility, the New Castle Correctional Facility, is operated by a private company, the GEO Corporation, under contract with the State of Indiana, but the prisoners housed there are considered to be IDOC prisoners.  The following facilities are those which house adult males only:

> Branchville Correctional Facility ("Branchville")
> Correctional Industrial Facility ("CIF")
> Indiana State Prison ("ISP")
> Miami Correctional Facility ("Miami")
> New Castle Correctional Facility ("New Castle")
> Pendleton Correctional Facility ("Pendleton")
> Plainfield Correctional Facility ("Plainfield")
> Putnamville Correctional Facility ("Putnamville")

4

Wabash Valley Correctional Facility Custody Control Unit ("CCU")
Wabash Valley Special Confinement Unit ("SCU")
Westville Correctional Facility ("Westville")
Westville Control Unit ("Westville WCU")

Moreover, a number of the IDOC facilities have segregation units.  The adult female facilities which have segregation units are (1) IWP--25 beds (administrative and disciplinary segregation); and (2) Rockville --24 beds (administrative and disciplinary segregation).

With respect to adult males, the following facilities have segregation units as specified in the table below:

| FACILITY | NATURE OF SEGREGATION UNIT | NUMBER OF BEDS |
|----------|----------------------------|----------------|
| Branchville | Administrative and Disciplinary | 30 |
| CIF | Administrative and Disciplinary | 22 |
| ISP | Administrative and Disciplinary | 424 |
| Miami | Administrative and Disciplinary | 100 |
| New Castle | Administrative and Disciplinary | 52 |
| Pendleton | Administrative and Disciplinary | 224 |
| Plainfield | Administrative and Disciplinary | 72 |
| Putnamville | Administrative and Disciplinary | 50 |
| CCU (Wabash Valley) | Administrative and Disciplinary | 72 |
| SCU (Wabash Valley) | Administrative and Disciplinary | 288 |
| Westville | Administrative and Disciplinary | 55 |
| (Westville)WCU | Administrative and Disciplinary | 165 |

Thus, there are a total of 1,554 segregation beds for males and 49 for females.

The special confinement unit ("SCU") at Wabash Valley is not part of the claims here.  A private settlement agreement filed on January 30, 2007, in *Mast v. Donahue*, No. 2:05-cv-37 (S.D. Ind.), provides that prisoners with Axis I mental diagnoses not be placed in the SCU at Wabash Valley.  Because of this settlement, this litigation does not concern prisoners confined in the Wabash Valley SCU.

**D.      Conditions in Segregation Units**

Subject to variations at the individual facilities, the conditions in each segregation unit within IDOC facilities are basically the same:

- All segregation prisoners spend the great majority of their day locked in their cells, up to 22 hours and 45 minutes per day and, for some prisoners, all day.

- All segregation units feature individual cells. The one exception to this is the overflow segregation area at Plainfield, which contains 14 additional cells with double-bunks that are used for administrative segregation purposes when the other beds are full.

- The cells all contain a bed and a sink/toilet unit. The bed may be concrete or metal and is attached to either the floor or the wall. Some cells also have a metal table or desk attached to the wall. Some have a metal stool secured to the cell floor. Some have a shelf.

- The cells are small. As an example, a segregation cell at the WCU is approximately 13' by 6'. The cells at the CCU and in the segregation units at Pendleton are approximately 8' by 10'.

- The cells generally have a small window to the outside world. Some institutions have cells without windows, but the outside of the cells face a wall with windows. This latter configuration predominates at Pendleton, whereas the former configuration predominates at New Castle.

- The doors on the cells vary. Most of the segregation units have solid doors with a small window in the door and a cuff-port that opens up for the purpose of serving meals or securing a prisoner's arms before he or she is removed. The segregation units at CIF, IWP, Miami, New Castle, Rockville, WCU, and CCU all have solid doors. The cell doors at ISP have bars, although five of them have a permanent lexan covering on them. The cell doors within the segregation units at Pendleton are one-half mesh, with a slot for food trays. At Plainfield, the majority of doors have bars, although some have solid doors. At Putnamville, one-half of the cell doors are solid, while the others are barred.

- Prisoners in segregation receive meals in their cells.

- IDOC policy provides that prisoners in administrative segregation are offered one hour of recreation five days a week. Prisoners who are in disciplinary segregation are offered recreation seven days a week, although on two of the days the recreation offered will be for only 30 minutes.

- Every segregation unit has outdoor and indoor recreation areas where prisoners can recreate by themselves. The exception to this is at ISP, which does not provide outdoor recreation to prisoners located in disciplinary segregation ("IDU"). Additionally, there is no indoor recreation at Pendleton. ISP allows prisoners to recreate together as does Plainfield, although most prisoners at Plainfield recreate by themselves. Even though prisoners, with the exception of those at ISP or possibly Plainfield, recreate by themselves, in a number of facilities the outdoor recreation

6

takes place in cages that are contiguous to each other so that more than one prisoner can be out, though separated, at the same time.  These outdoor recreation cages are used at CIF, Miami, New Castle, Pendleton, and the CCU at Wabash Valley. Other facilities, such as Putnamville, Rockville and the WCU have solitary recreation pads for individual prisoners.  The outdoor recreation area may have a basketball goal, although some have none. The indoor recreation takes place in small rooms which, depending on the facility, may have nothing in them or may have a telephone to make calls, a chin-up bar or an exercise bicycle.

- Prisoners are not required to go to recreation and prisoners frequently refuse to leave their cells for a number of reasons including, but not limited to, the early hours that recreation is offered, the fact that prisoners may be asleep and not hear the correctional officer offering recreation, and the fact that prisoners do not want to be chained up to be led to a recreation area.

- At times, recreation may be suspended for long periods of time for institutional reasons.

- Showers are offered at least three times a week for 10-15 minutes.  Prisoners are locked into the showers and remain there for long periods of time if correctional staff does not remove them. The showers are quite small and it can be distressing to be locked in them for long periods of time.

- When prisoners are released from their cells, even within the unit, to go to recreation or to the showers, the prisoners are secured.  Depending on the facility, the prisoners are placed in at least hand restraints and may be placed in leg restraints as well.  They are escorted by one or two officers.

- Hand restraints are secured when the prisoner, locked in his or her cell, puts his or her hands through the cuff-port to be secured.  The cell is then opened and leg restraints, if used, are placed on the prisoner. The prisoner may be cuffed behind his or her back or may be cuffed in the front with a "black box," which is a security cover placed over the handcuffs.

- Subject to losing the privilege because of disciplinary infractions, generally prisoners in administrative and disciplinary segregation may purchase radios.  In some facilities prisoners in administrative segregation may immediately purchase a television and those in disciplinary segregation may purchase televisions after 90 days of clear conduct (six months at PCF).  However, in many segregation units, including the following, there are no televisions available:  CIF (except for one cell), IWP, New Castle, Plainfield, Putnamville, Rockville, and Wabash Valley CCU.

- Although the IDOC recognizes a distinction between long-term and short-term segregation for male prisoners, many of the "short-term" units house prisoners longer than six months. Therefore, at ISP prisoners may be housed in disciplinary segregation (IDU) for up to one year and prisoners may be in administrative

segregation for up to four years.  At Miami, prisoners may be confined up to one year before being transferred to one of the long-term segregation units.  It is possible for segregation prisoners to stay for more than six months at New Castle, although the average stay is less than three months.  At Pendleton, which contains both short-term and long-term segregation prisoners, there are prisoners who are still formally classified as short-term prisoners who are being held for longer than six months in both administrative and disciplinary segregation.  Although the average length of stay is less than six months, there are some prisoners in segregation at Plainfield who are there for up to a year.  There are some prisoners in the CCU at Wabash Valley who may be there for more than one year.  In March 2011, there were some prisoners who had been there for two years.  Transfers had been submitted to move these prisoners to long-term segregation, but the transfers had not been processed or had been rejected.

- There are no separate long-term and short-term segregation units for female prisoners in the IDOC.  Some prisoners in segregation at IWP have been confined for more than one year.  At Rockville, disciplinary segregation prisoners do not normally stay for more than two months and the maximum stay on administrative segregation is approximately six months.

- The average length of stay in long-term administrative segregation at WCU is approximately three years.  For long-term disciplinary segregation, it is between one and two years.

- Some of the segregation units are air conditioned.  However, some, including those at Pendleton, ISP, and CCU, are not.

Additionally, the following correctional staffing patterns prevail on the segregation units at the various prisons.  Correctional officers work 12 hour shifts.

- Indiana State Prison – Three officers are assigned to D-East on each shift and three officers are assigned to IDU on each shift.  There is a day shift and night shift.  There is a sergeant and lieutenant assigned to each day shift (although the lieutenant on D-East is only present Sunday through Thursday).

- Indiana Women's Prison – There are two officers on each shift.  Additionally, there is a lieutenant assigned to the unit for an 8-hour shift on weekdays.  There is a sergeant who is responsible for this unit as well as others.

- Miami Correctional Facility – There are six officers and a sergeant on the day shift and four officers and one sergeant on the night shift.  One lieutenant is assigned on the weekdays.

- New Castle Correctional Facility – There are four officers and one sergeant on the day shift and three officers and a sergeant on the night shift.  There is a lieutenant

8

who has responsibility for this area, as well as others, on both shifts.

- Pendleton Correctional Facility – There are 5-7 officers and a sergeant and lieutenant during the day shift in the segregation units, with the exception of protective custody. During the evening the lieutenant is not there. There are three officers in protective custody.

- Plainfield Correctional Facility – When staffing is not full, there are two officers assigned to the segregation unit as well as a sergeant.

- Putnamville Correctional Facility – There are three officers assigned to the Maximum Security Unit (MSU) each shift as well as a sergeant and a lieutenant who are assigned to this and another unit five days a week.

- Rockville Correctional Facility – When fully staffed there are three officers assigned to the segregation unit on each shift and a lieutenant is assigned to this unit, and the other housing units, on each shift.

- Wabash Valley Correctional Facility – Five correctional officers are present on the day shift and four on the night shift.  There is a sergeant present as well.

- Westville Control Unit – There are three officers assigned to each pod for each twelve-hour shift.  There are supervisors on each shift as well.

- In addition to correctional officers, the units have one or more correctional counselors and case managers.  Correctional counselors serve as the liaison between the prisoners and other departments, and process transfers and bed moves and address other prisoner day-to-day needs; whereas the case manager is involved in planning for the prisoners' re-entry.

The following correctional programming is available for segregation prisoners:

- Although prisoners in segregation may leave their cells for recreation, showers, visits and medical and mental health appointments, they are generally otherwise confined in their single cells.

- There is generally no correctional programming available for segregation prisoners, even in their cells, although prisoners may receive chaplain visits and library materials in their cells.

- There are two correctional programs at the Westville Correctional Unit.  Neither are mental health programs.  One is the ACT program (for Actions, Consequences, and Treatment).  This is a program developed by the non-mental health staff person in charge of the WCU and features videos and workbooks that prisoners watch and complete in their cells.  The workbooks are reviewed by a correctional counselor.

9

- The ACT program features four phases, each lasting at least three months.  If the prisoner completes Phase 4 he will be recommended for discharge from segregation and placed at ISP, Pendleton, or Wabash Valley.  This allows the prisoner to leave segregation sooner.  Additionally, as the prisoner moves through the phases he will receive more commissary opportunities.

**E.    Mental Health**

The plaintiffs produced evidence from two expert witnesses, Kathryn A. Burns, M.D., M.P.A. ("Dr. Burns") and Robert Walsh, Ph.D. ("Dr. Walsh").  The Commissioner did not offer evidence from an expert. Dr. Burns, a psychiatrist, testified that a mental illness is a biologically based brain disorder that has a behavioral manifestation, some functional manifestation, and some psychological manifestations. Courts have used the term "mental disorder" to characterize "organic functional psychoses, neuroses, personality disorders, alcoholism, drug dependence, behavior disorders, and mental retardation."  *Ruiz v. Estelle*, 503 F. Supp. 1265, 1332 n.140 (S.D. Tex. 1980), *aff'd in part & rev'd in part*, 679 F.2d 1115 (5th Cir. 1982).  This definition is consistent with the evidence in this case and is adopted in this decision.

The Diagnostic and Statistical Manual, 4th edition ("DSM-IV") is published by the American Psychiatric Association and is an attempt to establish standard criteria for the classification of mental disorders.  The DSM-IV organizes each mental health diagnosis into five dimensions as follows:

| | |
|---|---|
| Axis I | clinical disorders, including the major mental disorders (such as schizophrenia, bipolar, depression and anxiety disorders) |
| Axis II | personality disorders and intellectual disabilities |
| Axis III | physical disorders which may or may not impact on psychological conditions |
| Axis IV | psychosocial and environmental factors that contribute to the disorder or impact on functioning |
| Axis V | the global assessment of functioning or GAF score |

To annotate on this in a limited fashion, Axis II includes a variety of personality disorders which are mental disorders that can cause severe personal and social disruption.  The GAF is a numeric score from 0-100 that mental health professionals use as a measure of the patient's symptom severity and level of social, occupational and psychological functioning, with 0 being the lowest and 100 being the highest.

A mental illness is properly characterized as "serious" based on two features of the diagnosis—one being the duration that the person has the illness and the second being the degree of disability or functional impairment that it causes.  In the context of this case, the term "seriously mentally ill" includes prisoners with a current diagnosis or recent significant history of a DSM-IV Axis I diagnosis of: schizophrenia, delusional disorder, psychotic disorder, schizoaffective disorder, schizophreniform disorder, major depression, bipolar disorder who are actively suicidal. And, the term includes prisoners who have engaged in a recent serious suicide attempt, regardless of diagnosis, who because of their mental illness have a recent history of hallucinations, or who have organic brain syndrome, mental retardation, or severe anxiety disorder, leading to significant functional impairment or self-harm behaviors or who have personality disorders manifesting in frequent episodes of psychosis or depression.  A psychosis is a break with reality.

**F.     Mental Health Units**

There are two mental health units within the IDOC.  These units are the New Castle Psychiatric Facility and the Special Needs Unit ("SNU") at Wabash Valley.  The Court will address each of these units in turn:

New Castle Psychiatric Facility.  The New Castle Psychiatric Facility, located at the New Castle Correctional Facility, has 128 beds and is a unit that is designed to provide specialized

mental health services.  The New Castle Psychiatric Facility is a unit that is admittedly for those seriously mentally ill prisoners who need the most intensive treatment.  It is not classified as a segregation unit by the IDOC.  Prisoners placed into the New Castle Psychiatric Facility are those who the mental health staffs at New Castle and the sending institution, in conjunction with Dr. Wiles, the Regional Mental Health Director for CMS, determine cannot function in a standard prison environment.  The following highlights features of the New Castle Psychiatric Facility for purposes of this litigation:

- The facility has eight ranges, 100-800, with 16 beds on each range.

- Included within the ranges are Stabilization and Assessment Unit ("SAU"), a Behavioral Adjustment Unit ("BAU"), and a Chronic Care Unit ("CCU").

- The 800 range is primarily the SAU.  Prisoners are housed there for a short period of time, generally a week.  They are then generally moved into either the CCU or BAU. On rare occasions the prisoners are stabilized and are returned to their sending prison.

- The 200, 400, and 600 ranges, and part of the 100 range are the CCU, which houses primarily prisoners with Axis I diagnoses.

- The 300, 500, and 700 ranges are for Axis II prisoners.

- The expectation is that prisoners within the New Castle Psychiatric Unit will be discharged to the SNU at Wabash, which is a step-down or less restrictive unit.

- Prisoners within the New Castle Psychiatric Unit are housed in single cells with a solid door containing a small window and a cuff-port that is used as a food slot.

- There are three phases of programming –

    Prisoners in Phase 1 are not allowed a television and have daily recreation in indoor or outdoor individual recreation cages.

    Prisoners in Phase 2, if they are not considered to be a danger to themselves, may have a television.  They also have recreation in indoor or outdoor individual recreation cages.

    Phase 1 and 2 prisoners are cuffed behind their back and escorted when they are out of their cells.

12

Phase 3 prisoners may recreate with others.

- All prisoners eat by themselves in their cells, although prisoners who have progressed through the program and are ready to leave are able to eat outside of their cells.

- All prisoners are supposed to have at least one group therapy meeting a week.  These are conducted in a room and the prisoners in Phase 1 and 2 are cuffed.

- The groups are primarily based on Dialectical Behavior Therapy ("DBT"), a form of therapy designed for persons with personality disorders.   At the WCU, there is also an effort for psychotherapy treatment to be based on Cognitive Behavioral Therapy ("CBT").

- In addition to at least one group session a week, prisoners are to have individual therapy as well.  This takes place in the same room that group therapy takes place or with the prisoner in a caged area in the day room that is in each unit.

- Individual prisoners may not be offered group every week and individual therapy may be as infrequent as two times, or less, a month.

- All medical records within the IDOC are electronic and all therapeutic and other important events are to be recorded.

- The mental health staff at the New Castle Psychiatric Facility consists of two psychologists, two master's level mental health professionals, and two psychiatric technicians with bachelor degrees.  Additionally, there is a psychiatrist who is there for 8-10 hours each week and who is responsible for medication management.

- Twice a day, a mental health staff person conducts rounds.  These are typically very cursory, involving walking by the cell front, looking into the cell and moving on. They may not involve any conversation with the prisoner.

- Phase 3 prisoners may be allowed out of their cells into the day room on each range for an hour of "free time."  However, all other prisoners are generally confined to their cells other than for therapy, showers, recreation, or visits, except for 3-4 prisoners who are in an educational program where they are placed in recreation cages inside a gymnasium and meet with teachers.  Additionally, some prisoners are brought out and put into the cages to attend religious services. Six prisoners are allowed to attend religious services in the day room.

The New Castle Psychiatric Unit, although not classified as a segregation unit, features similar isolation due to the great deal of time prisoners spend in their cells during Phases 1 and 2 and the infrequency of treatment.  The correctional staffs at the New Castle Psychiatric Unit

work in two daily shifts, a day shift and night shift.  During the day shift there are 17 officers, plus a sergeant and a lieutenant on duty.  During the evening shift, from 5:00 p.m. to 5:00 a.m., there are 8 officers, plus a sergeant on duty.

Dr. Burns' description of her site-visit to the New Castle Psychiatric Unit is informative and offers her insight into the adequacy of mental health care being provided there:

> Inmates in all phases of treatment displayed remarkably high levels of psychiatric symptoms; some were frankly psychotic with disorganized and delusional thinking; some displayed mood symptoms—manic as well as depressive symptoms.  This degree of pathology was not unexpected given that the MHU is identified as the place providing the highest or most intensive level of care.  However, what was surprising was the lack of intensive treatment provided: treatment plans are not adjusted or revised to address on-going or worsening symptoms; medication adjustments are infrequent and some inmates who had inappropriately been taken off of medications by one psychiatrist hadn't yet been seen by the new doctor even though they had been identified as priority cases; some inmates were receiving no treatment whatsoever; some were held in the program with no improvement or access to property, recreation or out-of-cell time for extended periods of time (years in some instances) without treatment.

The psychiatric shortfalls noted by Dr. Burns are significant in their impact on mentally ill prisoners at the New Castle Psychiatric Unit, although it is not known whether her description represented a chronic or simply an acute condition of that Unit.

SNU at Wabash Valley.  The SNU at Wabash Valley can house up to 134 prisoners and is a step-down unit for mentally ill prisoners to progress through and into general population.  It also is not classified as a segregation unit by the IDOC.  The SNU, like the New Castle Psychiatric Unit, houses prisoners who are unable to function in the general population because of their mental illness. The majority of the prisoners at the SNU have Axis I diagnoses, meaning a major mental disorder such as schizophrenia, bipolar disorder, depression or anxiety disorders. The following features of the SNU at Wabash Valley are relevant for purposes of this litigation:

- Most prisoners enter the SNU from the New Castle Psychiatric Unit.  When a prisoner enters the SNU, he is placed into a brief assessment and orientation phase.

This may only last 24 hours.

- The prisoner is then placed into a transitional phase that could last more than a month, although ideally it should be two weeks or less.

- After that, the prisoner is moved into Phase 3, which corresponds to the Phase 3 at New Castle Psychiatric Facility.

- The program is designed for the prisoner to progress through Phases 3, 4, and 5 and then into general population.

- Prisoners in the transitional phase are individually celled but are released for an hour of recreation each day and are released for meals that are taken in a common area.

- Prisoners in the transitional phase and in Phases 3, 4 and 5 receive a group session once a week that is a DBT-informed, skills training group. Prisoners in Phase 5 receive an additional transition group meeting each week.

- Every prisoner receives at least one individual therapy session a month. The individual therapy lasts for 20-60 minutes and takes place in the common area if there is a perceived need for greater security and, if not, in an office with the door open.

- During the transitional phase prisoners are held in cells on the right side of the unit. Once transition is over they are moved to the left side in double cells, although some prisoners continue to be housed individually.

- Once the prisoners are in Phase 3, they receive more recreation, including recreation in a gymnasium and in the common area at night.

- Prisoners in the transitional phase cannot have televisions. Those in the other phases may have a television.

- In Phase 4, prisoners are allowed to go to the main chow hall for meals as a group and are able to attend programming in the Offender Services Building, such as chapel and educational services. They can travel to the law library and institution library without an escort. Phase 5 prisoners have recreation and eat with a specific general population unit.

- If prisoners in the SNU break rules they may be placed in "phase modification," which means they are restricted to their cells for up to 45 days at a time. During this time period they receive individual therapy and recreation by themselves. They do not participate in group therapy.

- During both shifts there are generally three correctional officers on the unit and a sergeant.

G.      **Mentally Ill Prisoners in Segregation**

A survey done by the IDOC in early January 2010 disclosed that of the 26,753 IDOC prisoners at that time, 5,458 had an Axis I diagnosis, 1,758 had an Axis II diagnosis, and there were 1,349 prisoners who had both an Axis I and II diagnosis.  This means that 5,867 prisoners were diagnosed as mentally ill, which is 22% of the total IDOC prisoner population.  Dr. Burns found the prevalence of persons with Axis I and Axis II disorders in segregation to be around 33%.  Thus, there is a disproportionately high number of mentally ill prisoners within the segregation units within the IDOC.

The tally of mentally ill prisoners in segregation is listed in the chart below:

| SEGREGATION MENTAL HEALTH ROSTERS TALLIES | | | | |
|---|---|---|---|---|
| PRISON | TOTAL | PRISONERS WITH AXIS I (including those with Axis II as well) | PRISONERS WITH AXIS II ONLY | PRISONERS with both AXIS I & II |
| WESTVILLE | 11 | 11 | 0 | 4 |
| WCU | 81 | 58 | 23 | 31 |
| WVCF-CCU | 40 | 37 | 3 | 11 |
| PLAINFIELD | 29 | 29 | 0 | 23 |
| PENDLETON | 153 | 115 | 38 | 43 |
| INDIANA WOMEN'S | 4 | 3 | 1 | 1 |
| ROCKVILLE | 4 | 4 | 0 | 2 |
| BRANCHVILLE | 1 | 0 | 1 | 0 |
| PUTNAMVILLE | 31 | 31 | 0 | 2 |
| CORRECTIONAL INDUSTRIAL | 11 | 10 | 1 | 6 |
| NEW CASTLE (non-psychiatric) | 17 | 15 | 2 | 4 |
| MIAMI | 13 | 13 | 0 | 9 |
| INDIANA STATE PRISON | 38 | 32 | 6 | 1 |
| TOTAL | 433 | 358 | 75 | 137 |

The IDOC, through Corizon, has mental health staff in IDOC institutions.  IDOC policies are set forth in the Health Care Service Directives ("HCSD").  Each policy has a title and a

corresponding numerical designation, i.e.:

> *Mental Health Services Plan,* HCSD 4.03
> *Health Evaluation of Offenders in Segregation,* HCSD 2.25

The mental health evaluation sequence is as follows:

- If a prisoner with a mental health diagnosis is assigned to a segregation unit a health record review is to be completed within 24 hours. This is to include a suicide risk screening and observation by nursing staff.

- If the prisoner has a mental health diagnosis or if there are reasons to believe he has mental health needs, the lead psychologist or his or her designee will review the records to determine if there are reasons that the prisoner should not be admitted.

- Thereafter, the psychologist will review the chart of the prisoner and meet with him or her within a short period of time.

- A treatment plan will be drawn up for the prisoner.

In practice, however, mental health treatment is principally limited to issuance of medication, prisoner conversations with the mental health staff, and mental health staff's response to incidents of actual and attempted self-harm.  There is no group therapy for mentally ill prisoners in segregation.

There is a difference, however, between monitoring—referred to within the CCU, for example, as a "mental status check"—and treatment.  The pervasive function of mental health staff within the IDOC has become a mixture of responding to crises and responding to prisoner requests to be seen.  The 30-day reviews are ineffectual because of insufficient mental health staff and because of the circumstances on the unit, meaning the inability of custody staff to regularly place the prisoner in a setting where reasonable privacy in communication can be attained.  Although the loss of privacy is a condition of imprisonment, the loss of privacy in communication with medical staff restricts the prisoners ability to be candid when providing information.  Information in a prison is, as Dr. Walsh explained, a commodity.  The obtainment

17

of Information within a prison can be used to make a mentally ill prisoner more vulnerable in their relations with both custody staff and other inmates.

The mental health staff available in the segregation units, with the exception of psychiatrists, is as follows:

    a.     At Branchville, there is a mental health professional that spends 1-4 hours a week on the segregation unit.

    b.     At the CIF, there is a master's level mental health professional that spends approximately 2.5 hours a week in the segregation unit.

    c.     At ISP, there is a psychologist and three master's level clinicians who provide services for the segregation units.  One clinician is assigned to the IDU and one is assigned to the D unit.

    d.     At ISP, there is no specific staff assigned to the segregation unit, although a psychologist and a master's level mental health professional will provide services as necessary.

    e.     At Miami, mental health staffs are on the segregation unit approximately 25 hours a week.

    f.     The segregation unit at New Castle is serviced, as needed, by a psychologist and a master's level clinician.

    g.     In the segregation units at Pendleton, services are provided primarily by three mental health practitioners.  Two of them spend two afternoons a week in the units and one is there full-time.  There is only one psychologist in the institution and his contact with the segregation unit is limited to crisis management.

    h.     At Plainfield, the psychologist is in the segregation unit for 1-2 hours every Monday, Wednesday and Friday and a master's level mental health professional is on the unit 1-2 hours each Tuesday and Thursday.

    i.     At Putnamville, a psychologist is on the unit 10 hours a week as is a mental health professional. A mental health staff member is also on call for the unit, as needed.

    j.     At Rockville, mental health reviews are completed between 8:00 a.m.-12:00 p.m. on Wednesdays and 12:00 p.m.-4:30 p.m. on Fridays.

    k.     At Westville, there is one master's level practitioner in the segregation unit and a psychologist present 2-3 days a week.

l.      At the CCU at Wabash Valley, one psychologist is present part-time two days a week and a second psychologist is present part-time two days a week. There are also times when there is a master's level mental health professional as well. Additionally, a mental health professional provides services to the eight prisoners in CCU who are under 18 years old.

In addition, each segregation unit receives part-time services from a psychiatrist or, at New Castle, a nurse practitioner. These services are primarily limited to the prescription and management of medications designed to control mental health symptoms. A large majority of the prisoners with mental illnesses in segregation in the IDOC receive such medication. IDOC's mental health services plan provides that:

All offenders in segregation, even if no mental illness is present, must be evaluated by a qualified MHP (mental health professional) after no more than 30 days in segregation and every 30 days thereafter…. Mental health evaluations of offenders with a(n) identified mental health need(s) must be done in a location which affords the offender confidentiality; the evaluation may not be done at the offender's cell front.

Although a lack of privacy is the default in a prison setting, it is nonetheless essential that the mental health practitioner meet privately with the prisoner in a setting where other prisoners and correctional staff are not present. Otherwise, an accurate mental health assessment cannot occur.

A number of facilities, including Pendleton, Putnamville, and the WCU, do not interview prisoners with Axis II diagnoses outside of their cells. Prisoners, even those with Axis I diagnoses, frequently are not removed for an out-of-cell evaluation every 30 days but have them at their cell-fronts even though the prisoner has not refused to leave his or her cell. At times, prisoners are not removed for the out-of-cell evaluation because there are insufficient correctional staff to move the prisoners or because of other scheduling difficulties that are no fault of the prisoner.

And, prisoners often refuse to leave their cells. This occurs because the conversation with the therapist, even in private, may be only a few minutes and the prisoner believes it is not

useful and it is not worth the shackling.  Also, given the infrequency of potential contact with the mental health staff, the prisoner may refuse because he justifiably does not perceive it as useful. Further, an evaluation every 30 days is not frequent enough to disclose mental health problems, symptoms or deterioration.  The evaluations, when they occur, are generally very cursory.  The electronic medical records contain a template that allows the therapist to note objective symptoms as well as subjective ones.  Frequently, this template is completed in a manner such that the objective symptoms do not match the subjective ones, indicating that the records have been completed with little individual attention.  The template allows the mental health staff person to check one box marked "normal" and then all the objective symptoms are completed as normal.

Treatment plans are completed for each segregation prisoner with a mental health diagnosis and are to be reviewed periodically.  These are also generated through a template in the electronic medical records, are usually very general, and are completed without input from the prisoner.  Prisoners are able to request individual visits from mental health professionals in addition to the periodic reviews and may be seen more frequently without such a request. However, in the segregation units, with some exceptions, prisoners who are not on a suicide or self-harm watch are generally seen only monthly by the mental health professionals, not including psychiatrist visits.

Mentally ill prisoners who are on psychiatric medications are seen by a psychiatrist (or nurse practitioner at New Castle) at least every 90 days to review medication.  The role of the psychiatrist with regard to the care of mentally ill prisoners in segregation is to deal with medication issues.  Additionally, HCSD 2.25 requires that a member of the nursing staff, either an RN or LPN, make rounds on each segregation unit once a day.  This may include the time

when medication is given to the prisoner in his or her cell.  If no medication is delivered, the nurse is to look into the cell and attempt to ascertain if the prisoner's condition is satisfactory. However, this may just be a visual check without any conversation with the prisoner.  The prisoner may not even know that the check is being done, either because the prisoner is asleep or not otherwise attentive to the presence of the nurse.

The goal of mental health care in the correctional setting is to prevent harm from occurring to prisoners and to prevent prisoners from causing harm as a consequence of a mental condition that significantly influences their behavior.  The consensus of opinion in a professional body of literature on the subject presented in this case is that segregation is detrimental for people with serious mental illness because it makes their symptoms worse or because, at best, they do not get any better.

**H.      Segregation Harms Mentally Ill Prisoners**

Based on the extensive evidence presented in this case the Court finds that there are three ways in which segregation is harmful to prisoners with serious mental illness.  The first is the lack of social interaction, such that the isolation itself creates problems.  The second is that the isolation involves significant sensory deprivation. The third is the enforced idleness, permitting no activities or distractions. These factors can exacerbate the prisoners' symptoms of serious mental illness. This condition is known as decompensation, an exacerbation or worsening of symptoms and illness.

Decompensation can be manifested by a prisoner experiencing auditory or visual hallucinations, sleep disturbance, memory problems, anxiety, paranoia, depression, eating problems, or engaging in self-injury or suicide. These symptoms can produce behavior which constitutes a threat to the safety of staff or to that of the prisoner himself.  It can also produce

21

behavior which makes the assessment process more difficult, such as when a prisoner's paranoia induces him to refuse to leave his cell. Decompensation will not invariably occur when a seriously mentally ill prisoner is placed and kept in segregation, but may commence as soon as 10 days to two weeks after such placement.

Moreover, these pernicious effects of segregation on prisoners with serious mental illness are known to the IDOC. In a Mental Health Services Plan dated July 1, 2008, the IDOC stated that the primary goal of the mental health professional in one of the units at the New Castle Correctional Facility "is to prevent decompensation secondary to confinement in segregation housing." These effects are also known by the mental health providers who see, assess, and treat prisoners in segregation.

Additionally, these effects are known by the IDOC through the private settlement agreement to an earlier lawsuit, *Mast v. Donahue*, No. 2:05-cv-37 (S.D. Ind.), wherein the IDOC agreed that prisoners with Axis I diagnoses would not be placed in the Special Confinement Unit and to which the Commissioner of the IDOC stated:

> These offenders may have been diagnosed with a mental disorder that is worsened by confinement in a Secure Confinement Unit [SCU]. In these cases, it is in the best interests of the Department to attempt to obtain mental health treatment for these offenders rather than simply placing them in a long-term disciplinary segregation or Department-wide administrative segregation unit.

IDOC policy also recognizes that it is important that non-seriously mentally ill prisoners who are now confined in the Special Confinement Unit at Wabash Valley Correctional Facility be seen by a licensed mental health professional at least weekly and that the visits "take place in a setting where an accurate evaluation of the offender's mental health status can occur." Thus, the IDOC is aware that some mentally ill prisoners have mental disorders that are worsened by segregated confinement and that segregation can cause or accelerate and intensify

22

decompensation.  The deterioration and injury caused to mentally ill prisoners by segregation is documented by the IDOC in prisoner medical records, suicide and self-harm reports, and reports of use of force incidents.  As Dr. Walsh's report explains:

> The fact is that mentally ill people often have difficulty conforming to prison rules and regulations, and are more likely than other prisoners to be cited for disciplinary infractions.  In the isolation of these segregation units, there is a very high risk that mentally ill prisoners will decompensate and become more dysfunctional and harder to manage.

The evidence in this trial overwhelmingly shows that decompensation is psychologically painful to a mentally ill prisoner. "Psychological pain" includes pain and suffering associated with feeling depressed, anxious, having nightmares, memory problems, worries, and anxieties. This pain is also experienced as feelings of confusion, of being lost, and of being misunderstood. This pain produces suffering, and a delay in treating the condition complicates the condition, can accelerate or intensify decompensation, and can reduce the chances of a mentally ill prisoner achieving or re-establishing an optimal level of functioning. Decompensation is influenced by environmental circumstances, particularly isolation. The psychological pain associated with decompensation can produce in a mentally ill prisoner the desire to commit self-harm.  This could occur through what is termed a "command hallucination."  It can also occur because the prisoner seeks to relieve tension, to get attention, or to replace the psychological pain with physical pain.

Decompensation lengthens the time needed for a mentally ill prisoner's cognitive and psychological functioning to be restored and in some instances there will be no full restoration. Indeed, in some instances life hangs in the balance.  Tragically, a disproportionately high percentage of suicides are committed by prisoners in segregation compared with those in the general population of a prison system.  This is true both within the IDOC and in correctional

settings across the country.  Within the IDOC, since the beginning of 2007, 11 of 23 suicides were committed by mentally ill offenders in a segregated setting.  Thus, nearly one-half of the prisoner suicides during this period of time were committed by 22% of the total IDOC prisoner population.  Stated otherwise, the rate of prisoner suicides in segregation was nearly three times that of prisoner suicides in other housing units.

Further, decompensation multiplies and complicates symptoms of a mentally ill prisoner and is likely to require more intense intervention by mental health providers and custody staff alike. There have been instances in which decompensation of a mentally ill prisoner in segregation has resulted in his transfer from segregation to the New Castle Psychiatric Facility. When a prisoner is known to have threatened or attempted to commit suicide, he may be removed from segregation and placed on suicide watch in a cell with fewer amenities where he can be observed more closely by staff.  The result, in the short term, is an environment where the prisoner experiences greater deprivations and less privacy.  This also results, in the short term, in a decreased risk of repeated efforts of self-harm.  The prisoner's symptoms, however, will likely intensify unless this is accompanied by appropriate therapy.  Unfortunately, it is not.

To reiterate, the severe conditions in the segregation units cause a predictable deterioration of the mental health of seriously mentally ill prisoners and the IDOC has explicitly observed, diagnosed and noted patient decompensation. Records from a prisoner who recently committed suicide disclose that there was only one correctional staff member for the entire area and the staff person was unable to visually supervise the prisoner.  Records of another prisoner who committed suicide in late 2010 note that on one occasion shortly before his death he could not be brought to a mental health appointment because "custody unable to escort."  He was not seen for a week.  He was scheduled to be seen again shortly before his suicide, but his medical

records note that he "did not appear" for the appointment.  He committed suicide within days of the missed appointment.

As indicated above, lack of correctional staff prevents prisoners from having private conversations with mental health staff which is immediately harmful to the prisoners by delaying and/or preventing treatment which is necessary.  Accordingly, there is a difference between mental health monitoring and mental health treatment.  The IDOC is performing the former in its segregation units, but very little of the latter.  The Plaintiffs' thesis that the effect of segregation on mentally ill prisoners in Indiana is toxic to their welfare is supported by a preponderance of the evidence.   Without appropriate treatment and appropriate relief, the toxic effects of segregation will continue to cause serious injury to mentally ill prisoners.

## II.  CONCLUSIONS OF LAW

Based on the foregoing findings of fact, the Court makes the following conclusions of law:

### A.    Class Action Relief

As a threshold matter, the Court must determine whether this action may proceed as a class action. As a result of the Commissioner's failure to respond to the Plaintiffs' motion for class certification, the motion was granted subject to a thorough summary ruling.  As mentioned earlier, the Court found that this action qualifies for class-action treatment because all of the prerequisites of Federal Rule of Civil Procedure 23(a) and the requirements of 23(b)(2) are satisfied (*See* Dkt. 109). Although the Commissioner does not specifically ask the Court to decertify the class, in his post-trial brief he argues that "no class-wide relief is possible in this class action."

The Commissioner relies on the Supreme Court's decision in *Wal-Mart Stores, Inc. v.*

*Dukes*, 131 S. Ct. 2541 (2011), in seeking decertification of the class.  Insofar as is pertinent here, it was held in *Wal-Mart* that class certification of a putative class of 1.5 million current and former female employees of Wal-Mart Stores, Inc., was inappropriate because (1) the plaintiffs had failed to show that there was a common question of law or fact as Rule 23(a) requires and (2) the plaintiffs' claims for back pay could not be properly certified under Rule 23(b)(2).  *Id.* at 2556–57, 2561.  The Commissioner asserts that commonality is missing in this case.  The Court is not persuaded.  The mentally ill prisoners here, have demonstrated through a wealth of evidence, that the class is united by the common question of whether the lack of treatment and isolated living conditions in IDOC facilities violate the Eighth Amendment.

Although Rule 23 permits the court to modify a ruling concerning a previously certified class:  "An order that grants or denies class certification may be altered or amended before final judgment."  Fed. R. Civ. P. 23(c)(1)(C).  After a certification order is entered, "the judge remains free to modify it in the light of subsequent developments in the litigation."  *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 160 (1982).  That includes the ability to decertify a class should circumstances so dictate.  *Eggleston v. Chic. Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 896 (7th Cir. 1981).  In this case however, the Court found that the proposed class fit within Rule 23(b)(2) in that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.  Fed. R. Civ. P. 23(b)(2).  Because this action seeks injunctive relief to prevent future allegedly illegal deprivations of civil rights, it is a 'prime example[ ]' of a proper class under Rule 23(b)(2)."  *Ind. Prot. & Advocacy Servs. Comm'n* , 2010 WL 1737821, at *2.

The only manner in which the class certification should be changed at this point is to

*expand* the basis on which certification is warranted to include Rule 23(b)(3). *Jacks v. DirectSat USA, LLC*, No. 10 CV 1707, 2012 WL 2374444 (S.D. Ill. June 19, 2012) (citing *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 490 (7th Cir. 2012)); *Olson v. Brown*, 284 F.R.D. 398 (N.D. Ind. July 25, 2012).  In *Wal-Mart Stores, Inc.*, the Supreme Court specifically noted that it did not consider whether the class could properly be certified under Rule 23(b)(3) as opposed to Rule 23(b)(2).  131 S. Ct. at 2548–49 n.2.  Nothing in *Wal-Mart* itself makes the Rule 23(b)(2) class certified in this case improper.

That said, even if the Court concluded otherwise, IPAS itself is, as the designated entity pursuant to the PAIMI Act, entitled to proceed on behalf of the plaintiff class members.  The Commissioner's request that the plaintiff class be decertified based on *Wal-Mart* is **DENIED.**

## B.    42 U.S.C. § 1983

The action is brought pursuant to 42 U.S.C. § 1983, "the ubiquitous tort remedy for deprivations of rights secured by federal law (primarily the Fourteenth Amendment) by persons acting under color of state law." *Jackson v. City of Joliet*, 715 F.2d 1200, 1201 (7th Cir. 1983), *cert. denied*, 465 U.S. 1049 (1984).  To state a claim for relief under Section 1983, a plaintiff must allege that:  (1) he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon him by a person or persons acting under color of state law.  *Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004).  To sue under Section 1983, a plaintiff must first allege a violation of a federal statutory or constitutional *right* – not merely a violation of a federal *law*.  *See Blessing v Freestone*, 520 U.S. 329, 340 (1997).  "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

27

This Court has jurisdiction over both the subject matter and the parties to this action.  28 U.S.C. § 1331.  Because Section 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under Section 1983 is to identify the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

For convicted prisoners, the "constitutional source of a deliberate indifference claim is the Eighth Amendment's ban on cruel and unusual punishment."  *Cotts v. Osafo*, 692 F.3d 564, 567 (7th Cir. 2012); *see  Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment").  To incarcerate, society takes from prisoners the means to provide for their own needs.  Prisoners are dependent on the State for food, clothing, and necessary medical care.  A prison's failure to provide sustenance for inmates "may actually produce physical 'torture or a lingering death.'"  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (quoting *In re Kemmler*, 136 U.S. 436, 447 (1890)).

That said, the Eighth Amendment applies to states through the Due Process Clause of the Fourteenth Amendment.  *Gillis v. Litscher*, 468 F.3d 488, 491 (7th Cir. 2006) (citing *Robinson v. California*, 370 U.S. 660 (1962)).  The Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."  *Trop v. Dulles*, 356 U.S. 86, 101 (1958).  "Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." *Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011) (citations omitted); *see Estelle*, 429 U.S. at 102 (concluding that the Eighth Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . against which we must evaluate penal

28

measures" (citations omitted)).

Central to the present dispute, the Eighth Amendment's prohibition against cruel and unusual punishment imposes upon jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). This duty includes the obligation to "ensure that inmates receive adequate food, clothing, shelter, protection, and medical care." "[W]hile 'the Eighth Amendment forbids cruel and unusual punishments; it does not require the most intelligent, progressive, humane, or efficacious prison administration.'" *Thomas v. Ramos*, 130 F.3d 754, 763 (7th Cir. 1997) (quoting *Anderson v. Romero*, 72 F.3d 518, 524 (7th Cir. 1995)); *see Farmer*, 511 U.S. at 832. "After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Johnson v. Phelan*, 69 F.3d 144, 147 (7th Cir. 1995) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986), *cert. denied sub. nom., Johnson v. Sheahan*, 117 S. Ct. 506 (1996)).

In the context of medical care, the constitutional standard is:

> Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment. This is true whether the indifference is manifested by . . . prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.

*Estelle*, 429 U.S. at 104–05. "The Eighth Amendment safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose and prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs." *Kress v. CCA of Tenn., LLC.*, 694 F.3d 890, 892 (7th Cir. 2012) (internal quotation and citations omitted). Another phrasing of the proper standard is a useful reminder:

There is more to a subhuman-conditions case than subhuman conditions. "Punishment," for purposes of determining tort liability under 42 U.S.C. § 1983 for violation of the Eighth Amendment's prohibition against the infliction of cruel and unusual punishments, has both an objective and a subjective component. The objective component is the *nature* of the acts or practices alleged to constitute cruel and unusual punishment. Are they such acts or practices as would be deemed cruel and unusual if prescribed in a state or federal statute as the lawful punishment for a particular offense?

. . . .

The subjective component of unconstitutional "punishment" is the *intent* with which the acts or practices constituting the alleged punishment are inflicted. The minimum intent required is "*actual* knowledge of *impending* harm *easily* preventable." *Duckworth v. Franzen,* 780 F.2d 645, 653 (7th Cir. 1985) (emphasis added); see *Wilson v. Seiter,* 501 U.S. 294, 111 S. Ct. 2321, 115 L.Ed.2d 271 (1991); *McGill v. Duckworth,* 944 F.2d 344 (7th Cir. 1991). A failure of prison officials to act in such circumstances suggests that the officials actually want the prisoner to suffer the harm. If the harm is remote rather than immediate, or the officials don't know about it or can't do anything about it, the subjective component is not established and the suit fails. *See e.g., Wilson v. Seiter, supra,* 111 S. Ct. at 2326.

*Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992).

These factors notwithstanding, one who makes a claim under the cruel and unusual punishments clause must show that the state has created risk or inflicted pain pointlessly. "A medical need is considered sufficiently serious if the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (internal quotation marks and punctuation omitted). The medical condition need not be life-threatening; "it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Id.* (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)). Similarly, the fact that a prisoner received some treatment does not foreclose his deliberate indifference claim; deliberate indifference to a serious medical need may be manifested by "woefully inadequate action" as well as no action at all. *Reed v. McBride*, 178 F.3d 849, 854

(7th Cir. 1999).

## C.  **Deliberate Indifference**.

Deliberate indifference is proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and "either acts or fails to act in disregard of that risk." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011).   Delaying treatment may constitute deliberate indifference if such delay "exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) (citing *Estelle*, 429 U.S. at 104–05). "Even a few days' delay in addressing a severely painful but readily treatable condition suffices to state a claim of deliberate indifference." *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012).   Mere disagreements between providers are not proof of deliberate indifference to serious medical needs. *White v. Napoleon*, 897 F.2d 103, 110 (8th Cir. 1990). Deliberate indifference requires a showing of more than mere or gross negligence, but less than purposeful infliction of harm. *Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003). *See, e.g.*, *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 832 (7th Cir. 2009) (prisoner complaining of severe pain from his IV was not treated for four days); *Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007) (prisoner who dislocated his finger was not treated for two days); *Cooper v. Casey*, 97 F.3d 914, 916–17 (7th Cir. 1996) (prisoners beaten and maced by prison guards were not treated until the following day).

Likewise, a claim of denial of psychiatric care can, under certain circumstances, amount to deliberate indifference.  *Woodall v. Foti*, 648 F.2d 268 (5th Cir. 1981).  This is one important path which has emerged in Eighth Amendment jurisprudence in recent years. *See, e.g.*, *O'Connor v. Donaldson*, 422 U.S. 563, 573 (1975) (court stated that there was "no reason now to decide whether mentally ill persons dangerous to themselves or to others have a right to

31

treatment upon compulsory confinement by the State"); *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001) (recognizing that "the need for a mental illness to be treated could certainly be considered a serious medical need"). The awareness of a serious mental illness triggers a duty to provide adequate care. *See Cavalieri v. Shepard*, 321 F.3d 616, 621–22 (7th Cir. 2003); *Hall v. Ryan*, 957 F.2d 402, 405–06 (7th Cir. 1992). Moreover, the Seventh Circuit has recently recognized that not all cruel and unusual punishments in a prison setting involve the exertion of force against the body. *Thomas v. Illinois*, 697 F.3d 612, 615 (7th Cir. 2012) (citing *Washington v. Hively*, 695 F.3d 641, 643–44 (7th Cir. 2012)). Psychological pain exists. It is real and it results from many of the symptoms which are associated with the mentally ill. "Severe depression is not the blues. *It is a mental illness; and health professionals, in particular psychiatrists, not lawyers or judges, are the experts on it.*" *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995) (emphasis in original).

Bridging into the realm where prisoner suicide has occurred or is attempted, the Seventh Circuit has held that "prison officials violate the Eighth Amendment if they are cognizant of the significant likelihood that an inmate may imminently seek to take his own life and then fail to take reasonable steps to prevent the inmate from performing this act." *Sanville*, 266 F.3d at 737 (internal quotation marks omitted).

From a practical standpoint, deliberate indifference is "proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and 'either acts or fails to act in disregard of that risk.'" *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (internal quotation omitted). *Gomez*, a case in which there are parallels to both the evidence and the legal standards to be employed here, contains the following analysis:

> Here, the record demonstrates that the conditions of extreme social isolation and
> reduced environmental stimulation found in the Pelican Bay SHU will likely

inflict some degree of psychological trauma upon most inmates confined there for more than brief periods.  Clearly, this impact is not to be trivialized; however, for many inmates, it does not appear that the degree of mental injury suffered significantly exceeds the kind of generalized psychological pain that courts have found compatible with Eighth Amendment standards.  While a risk of a more serious injury is not non-existent, we are not persuaded, on the present record and given all the circumstances, that the risk of developing an injury to mental health of *sufficiently serious magnitude* due to current conditions in the SHU is high enough for the SHU population as a whole, to find that current conditions in the SHU are *per se* violative of the Eighth Amendment with respect to all potential inmates.

We can not, however, say the same for certain categories of inmates:  those who the record demonstrates are at a particularly high risk for suffering very serious or severe injury to their mental health, including overt paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness as a result of the conditions in the SHU.  Such inmates consist of the already mentally ill, as well as persons with borderline personality disorders, brain damage or mental retardation, impulse-ridden personalities, or a history of prior psychiatric problems or chronic depression.  For these inmates, placing them in the SHU is the mental equivalent of putting an asthmatic in a place with little air to breathe.  The risk is high enough, and the consequences serious enough, that we have no hesitancy in finding that the risk is plainly "unreasonable."  *Helling,* 509 U.S. at 37, 113 S. Ct. at 2481.  Such inmates are not required to endure the horrific suffering of a serious mental illness or major exacerbation of an existing mental illness before obtaining relief.  *Id.* at —— – ——, 113 S. Ct. at 2480–81.

We are acutely aware that defendants are entitled to substantial deference with respect to their management of the SHU.  However, subjecting individuals to conditions that are "very likely" to render them psychotic or otherwise inflict a serious mental illness or seriously exacerbate an existing mental illness can not be squared with evolving standards of humanity or decency, especially when certain aspects of those conditions appear to bear little relation to security concerns.  A risk this grave—this shocking and indecent—simply has no place in civilized society.  It is surely not one "today's society [would] choose[ ] to tolerate."  *Id.* at ——, 113 S. Ct. at 2482.  Indeed, it is inconceivable that any representative portion of our society would put its imprimatur on a plan to subject the mentally ill and other inmates described above to the SHU, knowing that severe psychological consequences will most probably befall those inmates.  Thus, with respect to this limited population of the inmate class, plaintiffs have established that continued confinement in the SHU, as it is currently constituted, deprives inmates of a minimal civilized level of one of life's necessities.

*Madrid v. Gomez*, 889 F. Supp. 1146, 1265–66 (N.D. Cal. 1995) (footnote omitted).

Applying the standard just described, the Court finds that mentally ill prisoners within the

IDOC segregation units are not receiving minimally adequate mental health care in terms of scope, intensity, and duration and the IDOC has been deliberately indifferent.  Based on the facts and law set forth in this Entry, therefore, it is the Court's conclusion that the treatment of mentally ill prisoners housed in IDOC segregation units and the New Castle Psychiatric Unit, and the failure to provide adequate treatment for such prisoners, violates the Eighth Amendment's proscription against the imposition of cruel and unusual punishment.  The Plaintiffs have met their burden in that respect and are entitled to prevail.

**D.      Remedy**

Once a constitutional violation is found, a federal court is required to tailor "the scope of the remedy" to fit "the nature and extent of the constitutional violation."  *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 420 (1977).  A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society.  *Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011).

> If government fails to fulfill this obligation, the courts have a responsibility to remedy the resulting Eighth Amendment violation.  *See Hutto v. Finney,* 437 U.S. 678, 687, n. 9, 98 S. Ct. 2565, 57 L.Ed.2d 522 (1978).  Courts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals.  *See Bell v. Wolfish,* 441 U.S. 520, 547–548, 99 S. Ct. 1861, 60 L.Ed.2d 447 (1979).  Courts nevertheless must not shrink from their obligation to "enforce the constitutional rights of all 'persons,' including prisoners."  *Cruz v. Beto,* 405 U.S. 319, 321, 92 S. Ct. 1079, 31 L.Ed.2d 263 (1972) *(per curiam)*.  Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.

*Id.* at 1928–29.

Having determined that a constitutional violation exists, the Court must now turn to the remedy it should impose.  The Plaintiffs seek equitable relief.  The standards for a permanent injunction are essentially the same as for a preliminary injunction, except that the plaintiff must

show actual success on the merits, not a likelihood of success, to obtain a permanent injunction. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 392 (1981). A party seeking a permanent injunction must satisfy the following four factors before the district court may grant a permanent injunction: 1) The existence of irreparable injury (including a continuing and imminent threat of harm); 2) remedies at law are inadequate to compensate for that threat of harm; 3) whether the balance of hardships between plaintiff and defendant tips in favor of a remedy in equity; and 4) the public interest would not be disserved by a permanent injunction. *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2748 (2010) (citing *eBay Inc. v. MercExchanges, L.L.C.,* 547 U.S. 388, 391 (2006)).

The relief to which the Plaintiffs are entitled is the delivery of mental health care which is within the bounds of the Eighth Amendment. The remedy may be as complex as the evidence of the violation, and *Plata* is again instructive, just as it was in addressing the merits of the Eighth Amendment claim. The overlay of the Prison Litigation Reform Act ("PLRA") on possible remedial measures was addressed by Judge McKinney of this Court in *Kress v. CCA of Tennessee*, No. 1:08-cv-00431-LJM-DML, 2011 WL 3154804, *2 (S.D. Ind. July 26, 2011), *aff'd.*, 694 F.3d 890 (7th Cir. 2012):

> In *Plata,* it was undisputed that constitutional violations still existed in the prisons at issue even though some remedial measures had been taken. 131 S. Ct. at 1935–36. In addition, the *Plata* trial court took into account "current prison conditions" in issuing its injunction requiring the State of California to remedy the overcrowding, and the Supreme Court approved of this approach. *Id.* at 1935 ("The . . . court properly admitted evidence of current conditions as relevant to the issues before it."); *see also id.* at 1936 ("[T]he record and opinion make clear that the decision . . . was based on current evidence pertaining to ongoing constitutional violations."). Contrary to Plaintiffs' assertion, *Plata* does not stand for the proposition that courts only may take into account conditions existing at the time a lawsuit is filed in determining whether injunctive relief is appropriate. Indeed, *Plata* confirms the PLRA's requirement that injunctive relief be instituted only as "necessary to correct a current and ongoing violation." *Id.* at 1930–31 (citing 18 U.S.C. § 3626).

A federal court possesses broad powers to remedy constitutional violations, but these powers are not boundless.  The federal court must find that a constitutional violation exists.  "[I]t is important to remember that judicial powers may be exercised only on the basis of a constitutional violation." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971).  When there is no continuing violation of federal law, injunctive relief is not part of a federal court's remedial powers.  *See Green v. Mansour*, 474 U.S. 64, 71 (1985).

Accordingly, within 45 days, the Court will schedule a conference with counsel for the parties to discuss and establish the appropriate development of a remedy.  The parties may consult *Westhefer v. Snyder*, Nos. 00-162-GPM, 00-708-GPM, 2012 WL 4904522 (S.D. Ill. Oct. 15, 2012), and the antecedent decisions in that case for ideas in formulating a remedial plan.

## III. <u>CONCLUSION</u>

"Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner v. Safley*, 482 U.S. 78, 84–85 (1987).  Nonetheless, "prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Id.* at 84.

In the midst of a complex and tumultuous environment such as a prison, "[f]ederal courts must take cognizance of the valid constitutional claims of prison inmates." *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996) (quoting *Turner*, 482 U.S. at 84).  That is precisely what the Plaintiffs established at trial because "[a] prison that deprives prisoners of . . . adequate medical care . . . is incompatible with the concept of human dignity . . . ." *Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011) (internal quotation marks omitted).  The Plaintiffs have prevailed as to their Eighth Amendment claim.  Appropriate further proceedings will be conducted as to the relief to

which the Plaintiffs are entitled and as to any ancillary matters.

      For now, no partial final judgment shall issue at this time as to the claim resolved in this Entry.


SO ORDERED.


Date: __12/31/2012__                         _____

                                          Hon. Tanya Walton Pratt, Judge
                                          United States District Court
                                          Southern District of Indiana


DISTRIBUTION:


David Ross Smith
INDIANA PROTECTION & ADVOCACY SERVICES
drsmith@ipas.in.gov

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Thomas E. Crishon
INDIANA PROTECTION & ADVOCACY SERVICES
tcrishon@ipas.in.gov

David A. Arthur
INDIANA OFFICE OF THE ATTORNEY GENERAL
david.arthur@atg.in.gov

Thomas D. Quigley
INDIANA OFFICE OF THE ATTORNEY GENERAL
tquigley@idoc.in.gov

Wade J. Hornbacher
INDIANA OFFICE OF THE ATTORNEY GENERAL
wade.hornbacher@atg.in.gov